UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ERNEST POPESCU,

Plaintiff,

v.

IRON MOUNTAIN DATA CENTERS, LLC,

Defendant.

Case No. 2:25-cv-00219-RSM

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This employment case comes before the Court on Defendant Iron Mountain Data Centers, LLC ("IMDC")'s Motion for Summary Judgment. Dkt. #18. Plaintiff Ernest Popescu brings causes of action for breach of contract and failure to pay wages for employment in 2022 and 2023. Dkt. #17. He states he is owed "a minimum of $1,178,629" in unpaid commissions. *Id*. at 4. In this Motion, IMDC states, "there is no evidence in the record that Plaintiff is owed commissions pertaining to his first year of employment, and Plaintiff has conceded this in sworn discovery responses." Dkt. #18 at 8. IMDC next argues that any dispute over whether it was obligated to

continue paying Popescu an "expired commission rate in the Plaintiff's offer letter" can be resolved in its favor as a matter of law. *Id.* at 8–9. The Court has reviewed Plaintiff's Response, Dkt. #22, and a Reply, Dkt. #23, and finds oral argument unnecessary. For the reasons below, the Court will grant in part and deny in part this Motion.

## II. BACKGROUND

Prior to his employment with IMDC, Mr. Popescu worked for Amazon Web Services and Meta as a planner of data centers, *i.e.* figuring out the "servers, racks, and ultimately the physical infrastructure space, the water, the power, the connectivity required…" *See* Dkt. #18-2 ("Popescu Dep."), 31:25-32:9 and 35:15-25.

On April 27, 2022, IMDC attempted to poach Mr. Popescu, offering him the role of Vice President, Global Head of Date Center Site Selection. *Id.* at 97:24-99:22; Dkt. #18-5. This would involve identifying land for the construction of data centers, having permits approved for the development of a data center on the site, and ensuring the site is able to receive required power. Popescu Dep. at 91:18 92:13, 106:6-25. Mr. Popescu took the offer and started working for IMDC.

At issue is Mr. Popescu's compensation package. Popescu was offered (and accepted) compensation in the form of: (1) an annual salary of $360,000 to be "reviewed annually"; (2) a "target incentive opportunity" (or bonus) of 35% of annualized salary as of December 31 of a given performance year based on "[c]ompany performance and your individual performance;" (3) $350,000 in annual sales commissions at 100% of the company's targeted attainment of bookings "based on" an earned commission rate of 1.5% of annual recurring revenue with a caveat that IMDC "reserves the right to modify or amend" the commissions; (4) about $250,000 in stock; and (5) other standard employment benefits. Popescu Dep. at 100:14-02:18, 128:10-29:3; Dkt. #18-6 at 2. The

offer letter made clear that IMDC was an "at-will employer" and that "you and the company are free to terminate employment at any time, with or without cause." Dkt. #18-6 at 2.

Mr. Popescu's began employment with IMDC on May 9, 2022.

Mr. Popescu does not take issue with the salary or stock he was paid, only the commissions. The commissions were based on annual recurring revenue ("ARR") from new bookings (sale or lease) of existing data center facilities. Popescu Dep at 104:18-08:7, 127:12-22; Dkt. #18-2 ("Kidd Dep."), 42:8-12, 54:11-16, 56:17-24. The offer letter guaranteed $350,000 in commissions for the first twelve months of Popescu's employment, even if new bookings did not reach the target ARR. Popescu Dep. at 103:21-04:1, 119:2 14, 129:22-30:3; Kidd Dep. at 67:3-15, 89:3-17; Dkt. #18-6 at 2. The $350,000 commission amount in the offer letter was determined based on a sales target; if IMDC's sales exceeded its annual target, Popescu would receive a "true-up" payment at the end of the 12-month period equal to the difference between (1) the $350,000 guarantee and (2) Popescu's actual commission earnings for the period of his initial year based on an earned commission rate of 1.5% of ARR. Popescu Dep. at 119:2-20:23; Kidd Dep. at 53:11-22; Dkt. #18-6 at 2.

As noted previously, the offer letter states that the "Company reserves the right to modify or amend the Quarterly Sales Commissions, as needed." Additionally, the offer letter stated that Popescu's commissions were paid in accordance with IMDC's "Sales Commission Plan" and that "Plan documents will be forthcoming." Dkt. #18-6 at 2. The parties dispute whether this Plan applied to Popescu's commissions.

Before the anniversary of his employment, Popescu was aware that IMDC would adjust his commissions rate after May 2023. Popescu Dep. at 199:10-201:13, 205:8-23, 207:4-10:3. Deposition testimony appears to indicate Popescu was told his commissions rate would be adjusted after his first anniversary to align with the $350,000 first-year target in his offer letter. *Id.* at 193:9-

94:15, 197:9-16 ("A likely reduction in the compensation"); Dkt. #18-17 at 2 ("I still don't know what my compensation for day 366+ of my employment is"). In October 2022, Plaintiff met with Senior Manager of Sales Operations Amy Drew to discuss his sales plan. Dkt. #18-7 (Drew Dep.), 66:5-67:12. At that meeting and in writing, Drew will testify that, as outlined in his offer letter, his target annual commission was $350,000, and the 1.5% ARR referenced therein was calculated based on a division of this number by IMDC's annual sales quota at the time of $23 million. *Id.* at 63:8-22, 68:18-70:13; Dkt. #18-12 at 2. Drew will also testify that in June or July 2023 she told Mr. Popescu that his commission rate would change after the anniversary of his first twelve months of employment. Drew Dep. at 71:5-72:11, 124:5 25:21. During his deposition, Plaintiff stated that, as of April of 2023, Executive Vice President Mark Kidd had made him aware that his commission rate would change. Popescu Dep. at 209:24-11:8; Dkt. #18-17 at 2 (stating on September 28, 2023, that "[i]t's been over 5 months [] since I heard my comp. would change…."). Popescu and Kidd repeatedly discussed the fact that Popescu's commission rate would adjust after the first year. Kidd Dep. at 43:20 45:1, 88:22-89:17, 96:3-19, 97:21-98:7, 157:3-23; Dkt. #18-17 at 2; Dkt. #18-18 at 2.

The undisputed record shows that Popescu repeatedly asked his supervisors for an update on what his commission rate would be going forward. Unfortunately for all involved, IMDC did not explicitly inform Plaintiff Popescu what his commission rate for year two would be until many months into that second year.

On August 30, 2023, Popescu emailed Kidd indicating that he "still [did not] know what [his] compensation for day 366+ of [his] employment" was. Dkt. #18-17 at 2. On September 28, 2023, Popescu emailed again stating "I am not sure how many people would work without knowing how much they are getting paid… I don't want this to go on much further…" *Id.* (ellipses in original). A few hours later, Kidd replied and informed Popescu that his commission rate for the period

following his one-year anniversary would be 0.2% of ARR. *Id.* at 2. Three short minutes later Popescu fired back, "I am not accepting a 0.2% commission… That is not what I came here for… I was expecting a reduction from 1.5% but not to 0.2%... if that is what's on the table, then you are essentially 'pushing me out.'" Dkt. #18-17 at 2.

Mr. Popescu attempted to negotiate with IMDC, but negotiations were unsuccessful. *See* Dkt #22-1 at 4. IMDC paid Plaintiff a total of $350,000 in commissions for the period from May 9, 2023, to November 20, 2023, based on that lower rate. *See* Dkt. #18-16 at 9. Mr. Popescu's employment with IMDC ended on November 20, 2023.

This litigation was filed in January, 2025. *See* Dkt. #1-1.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*,

512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B. Analysis**

**1. Breach of Contract Claim**

"Plaintiff's first-year compensation is not in dispute, and Plaintiff does not seek damages for that period." Dkt. #22 at 10. As for the second year, Popescu pleads that IMDC was obligated to pay commissions of 1.5% of ARR during the period between his one-year anniversary, May 9, 2023, and the date IMDC definitively articulated his new commission rate to him in writing, September 28, 2023. The difference between a rate of 1.5% and 0.2% is apparently over a million dollars in compensation.

To establish a breach of contract claim, a plaintiff must prove: (1) existence of a contract, (2) a material breach of that contract, and (3) resulting damage. *See St. John Med. Ctr. V. state ex. Rel. Dep't of Soc. & Health Servs.*, 110 Wn. App. 51,64,38 P.3d383 (2002). Whether a contract has been formed and/or breached "may be determined as a matter of law if reasonable minds could not differ." *P.E. Sys., LLC v. CPI Corp.,* 176 Wn.2d 198, 207, 289 P.3d 638 (2012). Under Washington law, "extrinsic evidence is admissible to assist the court in ascertaining the parties' intent and in interpreting the contract." *Spectrum Glass Co., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 129 Wn. App. 303, 311, 119 P.3d 854, 858 (2005) (citing *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565,569, 919 P.2d 594 (1996)). Courts may consider the contract's: (1) subject matter and objective; (2) circumstances around its making; (3) the parties' conduct; (4) reasonableness of the parties' interpretations; (5) preliminary negotiation party statements; (6) usages of trade; and (7) the parties' course of dealing. *Id.* (citing *Berg v. Hudesman*, 115 Wn.2d 657, 666-68, 801 P.2d 222

(1990)). However, the court may not consider extrinsic evidence "to show a party's unilateral or subjective intent as to the meaning of a contract word or term[.]" *Id.* (citing *Hollis v. Garwall, Inc.,* 137 Wn.2d 683, 695, 974 P.2d 836 1999)). "Interpreting a contract provision is a question of law when (1) the interpretation does not depend on the use of extrinsic evidence or (2) only one reasonable inference can be drawn from the extrinsic evidence." *Id.* (citing *Tanner Elec. Co-op. v. Puget Sound Power Light Co,* 128 Wn. 2d 656, 674, 911 P.2d 1301 (1996)).

"If an employment contract is terminable at will, an employer may unilaterally modify the terms of employment, so long as the employee receives reasonable notice and the changes apply prospectively." *Ranko v. Gulf Marine Prods. Co.*, 2020 U.S. Dist. LEXIS 176961, *4 (W.D. Wash. Sep. 25, 2020) (citing *Duncan v. Ala. USA Fed. Credit Union, Inc.*, 148 Wn. App. 52, 58, 70, 77-78, 199 P.3d 991 & n.100 (2008)).

The Court has reviewed the contract at issue and finds that certain terms related to the commissions are clear and unambiguous: IMDC "reserved the right to modify or amend" the amount of this payment. It is also clear from the record that all involved knew that the commission rate of 1.5% applied only to the first year and would be modified by IMDC. It is uncontested that Popescu continued working after the first year with no idea what his commissions rate would be. What remains in dispute is whether the notice of the change provided by IMDC was "reasonable," when the change occurred, and whether the change from 1.5% to "unknown" can reasonably be said to "apply prospectively" as required by law, keeping in mind that IMDC felt free to later calculate the 0.2% commissions retrospectively, *i.e.* for work done prior to the calculation and/or announcement of that number. Without answers to these questions, it cannot be determined whether or not the 1.5% rate in the offer letter continued into the second year or how much is owed to the Plaintiff. The answers to these questions cannot be found in the text of the agreement. Rather, the Court is being

asked to review conflicting deposition testimony and to interpret the reasonableness of a course of dealing involving many witnesses and exhibits. This requires settling questions of fact and mixed questions of fact and law. In any event, the gap in time when Mr. Popescu was working without knowing his commission rate was not so short as to allow a change like this to be reasonable as a matter of law. Summary judgment cannot be granted on this claim.

**2. Failure to Pay Wages Claim**

Under Washington law, an employer who "[w]illfully and with intent to deprive the employee of any part of his wages," withholds wages "shall be guilty of a misdemeanor." RCW 49.52.050(2). The employer who violates this statute "shall be liable in a civil action by the aggrieved employee" for twice the amount of the wages withheld in addition to attorney's fees and costs. RCW 49.52.070. The "critical determination" in a case alleging willful withholding of wages is whether the employer's failure to pay wages was willful. *Duncan*, 148 Wn. App. at 78–79. Courts find that withholding of wages is willful "when it is the result of a knowing and intentional act and not the result of a bona fide dispute." *Lillig v. Becton-Dickinson*, 105 Wn.2d 652, 659, 105 Wn.2d 653, 717 P.2d 1371 (1986). "A bona fide dispute is one that is 'fairly debatable.'" *Duncan*, 148 Wn. App at 79 (quoting *Schilling v. Radio Holdings, Inc.*, 13 Wn.2d 152, 161, 961 P.2d 371 (1998)). An employer's withholding of wages does not fall within the operation of RCW 49.52.050(2) and 49.52.070 if the employer holds "a genuine belief that he is not obligated to pay certain wages …." *Ebling v. Gove's Cove, Inc.*, 34 Wn. App. 495, 500, 663 P.2d 132 (1983). "Ordinarily, the issue of whether an employer acts 'willfully' for the purposes of RCW 49.52.070 is a question of fact." *Duncan*, 148 Wn. App at 79. However, where there is no dispute as to material facts, and reasonable minds could reach but one conclusion from those facts, the matter may be decided on summary judgment. *Id.*

IMDC argues that "even if this Court were ultimately to conclude that some material factual dispute remains concerning Plaintiff's entitlement to any additional commissions, it is undisputed that a bona fide dispute existed between IMDC and Plaintiff regarding the commission rate to which Plaintiff was entitled for the period between May 9, 2023 (his twelve-month anniversary) and September 28, 2023…" Dkt. #18 at 33. The Court agrees. The record is undisputed that the parties knew that the commission amount was adjustable after the first year. That there was a contemporaneous bona fide dispute about the change in the commission rate is amply demonstrated by the record. The parties engaged in countless meetings, discussions, and emails back and forth trying to resolve this issue, all the while with Popescu continuing to work for IMDC without knowing the answer. The key remaining question is whether the notice provided to Mr. Popescu was reasonable; the failure to pay any additional amount owed was the result of a bona fide dispute which may yet be resolved in either party's favor. Accordingly, this claim is dismissed as a matter of law.

## IV. CONCLUSION

Having considered the briefing and the remainder of the record, the Court hereby finds and ORDERS that Defendant's Motion for Summary Judgment, Dkt. #18, is GRANTED IN PART AND DENIED IN PART as stated above. Plaintiff's failure to pay wages claim is DISMISSED.

DATED this 23rd day of September, 2026.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE